## TRAVIS *versus* ALLEN.

A having shipped goods from New York for Mobile, which became damaged on the passage, proceeded to call the Port Wardens to view the goods, with the purpose of charging the ship owners. B, the agent of the ship owners, promised A that if he would desist, and proceed to sell his goods at auction, he, B, would pay the amount of the loss. In an action to recover the amount of the loss from B—Held—

That the promise was not within the statute of frauds, but that B, was liable.

Travis brought his action of assumpsit in Mobile Circuit Court, to recover of Allen the sum of one hundred and sixty eight dollars and thirty two cents. Allen was the agent, or consignee of the owners of the ship Amelia, on which vessel Travis had shipped sundry goods from New York to Mobile. On the passage, the goods became damaged, and Travis was about calling on the Port Wardens to survey the goods, in order to charge the owners. Allen then told the Plaintiff that if he would not proceed thus, but would brush up his goods, and sell them at auction, he would pay whatever amount should accrue between the auction sale, and the original invoice price. Travis, in compliance with this undertaking, sold the goods and brought the present action to recover for the loss sustained.

The defendant demurred to the declaration; and the Court considering the case within the statute of frauds, sustained the demurrer. To reverse the judgment thus rendered, the case was brought to this Court, and the same assigned for error.

*Hitchcock*, for Plaintiff—*Crawford, contra.*

TRAVIS *VS.* ALLEN.

SAFFOLD, J.—The relative situation of the parties, as plaintiff and defendant, was the same in the Court below that it is in this Court. The declaration was in assumpsit, and contained three counts, in substance as follows : That the plaintiff Travis shipped goods from New York to Mobile, in the ship Amelia, which goods were damaged on the passage. Allen was the agent and consignee of the ship owners. Travis having determined to call the port wardens to have a survey of the goods with a view to charge the ship owners, and being about to do so, Allen then told him if he would not thus proceed, but would clean and brush up the goods and sell them to the best advantage at auction, he, Allen would pay him the difference between the invoice price, and that for which they should sell. Travis did so pursuant to Allen's request, and the loss amounted to one hundred and sixty eight dollars thirty two cents ; for which the action was brought.

Allen demurred generally to the declaration ; and the Court considering the case within the statute of frauds, sustained the demurrer.

The judgment on demurrer, is the cause assigned for error.

Our statute of frauds, so far as regards this contest, is a literal transcript of the English statute of 29 Charles II, as is also the statute of New York, and of most or all the other States of the Union. The decisions, therefore, which have been correctly made under either of the others, are good authority in reference to ours. Its language is, "that no action shall be brought whereby to charge the defendant upon any special promise to answer for the debt, default or miscarriage of another person, unless the agree-

ment on which such action shall be brought, or some memorandum or note thereof, shall be in writing and signed by the party to be charged therewith or some other person thereunto by him lawfully authorised." Here it is conceded the agreement was not in writing; and the question is, was the contract void?

The classification of contracts involving this doctrine, as recognised by the Supreme Court of New York, and many other tribunals of the highest respectability, is,

1. Cases in which the guaranty or promise is collateral to the principal contract, but is made at the same time and becomes an essential ground of the credit given to the principal or direct debtor. In such there is not, nor need be, any other consideration than that moving between the creditor and original debtor.

2. Cases in which the collateral undertaking is subsequent to the creation of the debt, and was not the inducement to it, though the subsisting liability is the ground of the promise, without any distinct and unconnected inducement. There must be some further consideration shewn, having an immediate respect to such liability, for the consideration of the original debt will not attach to this subsequent promise. And,

3. Cases where the promise to pay the debt of another, arises out of some *new* and *original consideration* of benefit or harm, moving between the newly contracting parties—*Leonard* vs. *Oredenburgh.*[a] The two first classes of cases are within the statute of frauds, but the last is not—*S. C. and note* g, *appended, also* 1 *Saund.* 211, *note* 2.

[a] 8 Johns. Rep. 28.

A distinction has often prevailed (more uniformly in the early decisions,) between what were considered *original*, and those deemed *collateral* undertakings; and this distinction has been recognised as the criterion by which to determine whether or not the contract was affected by the statute. That the former were not, and the latter were—that if the person for whose *debt, duty or miscarriage*, the undertaking was made, was liable at all, so that the entire responsibility did not rest upon the other person, his promise was considered collateral, and if not reduced to writing, was void. If, however, no other person was liable for the *same debt, duty or miscarriage*, although the other person may have been liable for a *distinct debt, &c.*, which was the measure of the one in question; in such case the undertaking has been considered an original one, and not within the statute. Yet as has been well observed by an eminent jurist, it should be borne in mind that although *collateral promise* has become the technical phrase, whereby the promise within the statute has generally been distinguished, such words do not occur in the statute itself, and cannot therefore, be taken as a certain criterion, in deciding whether a promise for another is or is not within the meaning of this law. The promise, mentioned in the statute, is as well that whereby a man undertakes to answer for the debt, as for the *default* of another.[a] The principle is also [a]Roberts on F. 225. held by the same writer and others of equal merit, and from which I have no disposition to dissent, that the policy of this statute, like most others determining the rights of property, entitles it to a just and liberal construction. I would administer it according to what appears to have been its true spirit and intent—neither abridging nor extending its operation.

a 3 Burr 1886.

The case of *Williams* vs. *Leper*,[a] cited on the part of the plaintiff, is one justly supposed to afford the most satisfactory illustration of the branch of the statute involved in this case. There, Leper, in the capacity of broker, being about to sell the effects of an insolvent debtor for the benefit of his creditors, Williams, the landlord, came to distrain the goods in the house—the broker promised the landlord to pay his debt if he would desist from distraining : and he did thereupon desist, the agreement being by parol.

The Court decided that undertaking not to be within the statute of frauds. That the *res gestæ* entitled the landlord to recover his rent of the broker. The reason employed was that Leper was a trustee for all the creditors, and was obliged to pay the landlord, who had the prior lien—that the goods were the fund out of which the debt was to be paid; and that it was not a collateral, but an original undertaking.

Although it is true, as contended in behalf of the defendant, that there is some dissimilarity between the features of that case and this, yet they are believed in principle to bear a material analogy to each other. Without the aid of the agreement, Leper was as free from responsibility for the rent, as was Allen for the damages sustained in the goods; they were both in the exercise of an agency which subjected them to a moral obligation to make the promises they did, and to comply with them, or otherwise to indemnify the plaintiffs—both were clothed with delegated discretion to render justice to the adverse parties without litigation or delay, and (as I think may be fairly inferred in this case as well as the other) without any individual loss or responsibility, as the agency of each afforded the means to perform his agree-

ment.     Admitting that in this case the claim for
the damages still exist against the ship owners,
it was equally so in the case cited ; except, that there
the certain or most probable means of obtaining sa-
tisfaction were lost in consequence of the agreement ;
and in this case from like cause, the safe and usual
course of having the damages assessed by the war-
dens, and abandoning the goods to the ship owners,
as intended, was defeated—a procedure, which, accor-
ding to its ordinary results and probable tendency,
would have secured to the plaintiff quite as much
as the defendant promised him, and without delay.
In that case it is also true, that the landlord had a
lien on the effects for his rent, and some of the Judg-
es considered the agreement in the nature of a pur-
chase of the effects from him by the broker.    In this
case, the effect of the agreement was to induce the
plaintiff to retain and sell for his own benefit, and at
auction, (according to the facts stated) damaged goods
which otherwise he would have had a right to aban-
don at the risk of ship-owners.    It also imposed on
him the expense of cleaning the goods, preparatory
to the sale, and if it be admitted, that notwithstanding
the undertaking, the plaintiff was entitled, on suffi-
cient proof, to redress by suit against the owners of
the vessel, it is evident he was placed in a very un-
favorable attitude for doing so ; for though the sur-
vey of the wardens would not have been of itself evi-
dence of the damages, the testimony of the individu-
also holding the office and who had acted under the
solemnity of an oath, would have been much the
most safe and satisfactory evidence that the case ad-
mitted of.    Nor can it be overlooked, that the trans-
action had a direct tendency, so far as to delude the

plaintiff, as to induce him to neglect the precaution of having the goods inspected by any persons before the sale, who would have been competent witnesses to prove the extent of the damages. It is also worthy of remark, that as a consequence of the sale at auction, there was probably a sacrifice in the true value of the goods. If so, and the plaintiff was prompted to it by an illegal contract, he could not expect indemnity for so much, in an action against the owners of the vessel; nor can it appear that they would not have been enabled to secure themselves out of the damaged goods by private sale, or otherwise, had they been abandoned to them according to the usual course of commerce.

In an action against them, the plaintiff must have encountered this objection, as well as resistance, on the ground of the different agreement between himself and their agent; together with the difficulty arising from the delay in electing his remedy; and the, probably, imperfect testimony—all which were consequences of the undertaking, which is the foundation of this action, and which from its nature and effects, would appear to constitute a new contract on a distinct consideration. The ship-owners were never chargeable with this particular debt. Their responsibility was for the price of the goods, if abandoned: otherwise, for the true amount of the damages sustained, according to the remedy sought. Their liability, therefore, was but the inducement and measure of this debt; so that in any view of the case, this must be regarded as an original demand, as contemplated in various decisions on the statute. It has been ruled, that if the original debtor is intended to be only *relatively*, and not absolutely discharg-

ed, and the person, promising, substitutes himself as the debtor, in consideration of the *release* of the party indebted, *quoad the original creditor*, the right of suing for the orignal debt being only understood to be transferred, the transaction assumes a character which, in many cases, has been considered not within the statute.[a] It is admitted that no certain abstract rule in relation to this statute, has or can be laid down for the government of all other cases, but that much has of necessity been left to float on the facts and circumstances of the particular cases.[b] Yet it is believed the views I have advanced are in accordance with the most current rules of decision in the several Courts of the United States, as well as the great variety of cases reviewed in *Roberts on Frauds*.

[a] Roberts on Fr. 225.

[b] Idem 223.

Of the latter cases, it is deemed sufficient to notice but one other.[c] It was an action for the repairs of a carriage : it belonged to a Mr. Copey, and had been sent by the defendant to the plaintiffs to be repaired, the orders concerning it being given by the defendant. The bill for the repairs was made out in the name of Copey, who was known to the plaintiffs as the owner. The work being done, the defendant sent an order to pack up the carriage and send it on board a ship : the plaintiffs on this sent to know who was to pay for it : the defendant replied, he had sent it and would pay for it. The carriage was sent, and payment required of the defendant : he questioned the price, and refused to pay, but said he had the money to pay it, without explaining whether it was his own or Copey's. Upon these facts, Chief Justice *Eldon*, on the principles of the case of *Williams* vs. *Leper*, decided that the circumstances took the case out of the statute.

[c] 3 Esp. N. P. Cas. 83.

This, it is true, was a trial at *nisi prius*, but it is recognised as sound law. It should be conceded, that some of the adjudged cases, of equal authority, maintain doctrines apparently in conflict with the principles of this decision ; but from a comparison of the various decisions on the subject, it is believed the weight of authority fully sustains the conclusions to which I have arrived ; and such is the unanimous opinion of the Court.

Judgment reversed, and the cause remanded for further proceedings.

CRENSHAW, J. not sitting.